AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

**FILED**

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Information That is Stored at Premises Controlled by
Google

)
)
)
)
)
)

Case No. **23 MR 1304**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____Northern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. § 245(b)(1)(A) | Interference with federally protected activities |
| 18 U.S.C. § 924(c) | Use of a firearm during and in relation to a crime of violence |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

SA John W. Howard, Federal Bureau of Investigation

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____telephone_____ *(specify reliable electronic means).*

Date: ___June 29, 2023___

*Judge's signature*

City and state: ___Albuquerque, New Mexico___

Jennifer M. Rozzoni, United States Magistrate Judge

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

|  | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE | **FILED UNDER SEAL**<br><br><br>Case No. _____ |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Jack W. Howard, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a warrant to search information that is stored at premises controlled by Google, an electronic communication service and remote computing service provider headquartered in Mountain View, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a warrant under 18 U.S.C. § 2703(c)(1)(A) to require Google to disclose to the government the information further described in Attachment B.I. The government will then review that information and seize the information that is further described in Attachment B.II.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since 2004. I have worked Complex Financial Crimes, Public Corruption, Color of Law matters, Firearms matters, and Money Laundering. I am an Adjunct Faculty Member at the FBI Academy for Frauds and Swindles, Money Laundering, and Public Corruption matters. As part of my investigative duties, I have applied for and/or executed numerous search warrants, including warrants to search physical locations, electronic devices, and accounts maintained by

1

Internet service providers. In addition, I have conducted numerous investigations involving telephone records and location records, including cell site records, prospective location information, toll records and subscriber information, and I have become familiar with the manner in which these records are generated and maintained by electronic communication service and remote computing service providers like Google.

3.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. While related search warrant affidavits have included numerous additional facts, I ask that this Court review and approve this affidavit solely on the basis of the facts set forth herein.

4.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 245(b)(1)(A), Interference with Federally Protected Activities and 18 U.S.C. § 924(c), Use of a Firearm During and in Relation to a Crime of Violence have occurred from on or about December 4, 2022, through on or about January 3, 2023. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, and fruits of these crimes as further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND RELATING TO GOOGLE AND RELEVANT TECHNOLOGY

6.      Based on my training and experience, I know that cellular devices, such as mobile telephone(s), are wireless devices that enable their users to send or receive wire and/or electronic

2

communications using the networks provided by cellular service providers.  Using cellular

networks, users of many cellular devices can send and receive communications over the Internet.

7.     I also know that many devices, including but not limited to cellular devices, have

the ability to connect to wireless Internet ("wi-fi") access points if the user enables wi-fi

connectivity.  These devices can, in such cases, enable their users to send or receive wire and/or

electronic communications via the wi-fi network.  A tablet such as an iPad is an example of a

device that may not have cellular service but that could connect to the Internet via wi-fi.  Wi-fi

access points, such as those created through the use of a router and offered in places like homes,

hotels, airports, and coffee shops, are identified by a service set identifier ("SSID") that functions

as the name of the wi-fi network.  In general, devices with wi-fi capability routinely scan their

environment to determine what wi-fi access points are within range and will display the names of

networks within range under the device's wi-fi settings.

8.     Based on my training and experience, I also know that many devices, including

many cellular and mobile devices, feature Bluetooth functionality.  Bluetooth allows for short-

range wireless connections between devices, such as between a device such as a cellular phone

or tablet and Bluetooth-enabled headphones.  Bluetooth uses radio waves to allow the devices to

exchange information.  When Bluetooth is enabled, a device routinely scans its environment to

identify Bluetooth devices, which emit beacons that can be detected by devices within the

Bluetooth device's transmission range, to which it might connect.

9.     Based on my training and experience, I also know that many cellular devices,

such as mobile telephones, include global positioning system ("GPS") technology.  Using this

technology, the device can determine its precise geographical coordinates.  If permitted by the

user, this information is often used by apps installed on a device as part of the apps' operation.

3

10.     Based on my training and experience, I know Google is a company that, among other things, offers an operating system ("OS") for mobile devices, including cellular phones, known as Android.  Nearly every device using the Android operating system has an associated Google account, and users are prompted to add a Google account when they first turn on a new Android device.

11.     In addition, based on my training and experience, I know that Google offers numerous apps and online-based services, including messaging and calling (*e.g.*, Gmail, Hangouts, Duo, Voice), navigation (Maps), search engine (Google Search), and file creation, storage, and sharing (*e.g.*, Drive, Keep, Photos, and YouTube).  Many of these services are accessible only to users who have signed in to their Google accounts.  An individual can obtain a Google account by registering with Google, and the account identifier typically is in the form of a Gmail address (*e.g.*, example@gmail.com).  Other services, such as Maps and YouTube, can be used with limited functionality without the user being signed in to a Google account.

12.     Based on my training and experience, I also know Google offers an Internet browser known as Chrome that can be used on both computers and mobile devices.  A user has the ability to sign-in to a Google account while using Chrome, which allows the user's bookmarks, browsing history, and other settings to be uploaded to Google and then synced across the various devices on which the subscriber may use the Chrome browsing software, although Chrome can also be used without signing into a Google account.  Chrome is not limited to mobile devices running the Android operating system and can also be installed and used on Apple devices and Windows computers, among others.

13.     Based on my training and experience, I know that, in the context of mobile devices, Google's cloud-based services can be accessed either via the device's Internet browser

4

or via apps offered by Google that have been downloaded onto the device. Google apps exist

for, and can be downloaded to, devices that do not run the Android operating system, such as

Apple devices.

14.     According to my training and experience, as well as open-source materials

published by Google, I know that Google offers accountholders a service called "Location

History," which authorizes Google, when certain prerequisites are satisfied, to collect and retain

a record of the locations where Google calculated a device to be based on information

transmitted to Google by the device. That Location History is stored on Google servers, and it is

associated with the Google account that is associated with the device. Each accountholder may

view their Location History and may delete all or part of it at any time.

15.     Based on my training and experience, I know that the location information

collected by Google and stored within an account's Location History is derived from sources

including GPS data and information about the wi-fi access points and Bluetooth beacons within

range of the device. Google uses this information to calculate the device's estimated latitude and

longitude, which varies in its accuracy depending on the source of the data. Google records the

margin of error for its calculation as to the location of a device as a meter radius, referred to by

Google as a "maps display radius," for each latitude and longitude point.

16.     Based on open-source materials published by Google and my training and

experience, I know that Location History is not turned on by default. A Google accountholder

must opt-in to Location History and must enable location reporting with respect to each specific

device and application on which they use their Google account in order for that usage to be

recorded in Location History. A Google accountholder can also prevent additional Location

History records from being created at any time by turning off the Location History setting for

their Google account or by disabling location reporting for a particular device or Google application.  When Location History is enabled, however, Google collects and retains location data for each device with Location Services enabled, associates it with the relevant Google account, and then uses this information for various purposes, including to tailor search results based on the user's location, to determine the user's location when Google Maps is used, and to provide location-based advertising.  As noted above, the Google accountholder also has the ability to view and, if desired, delete some or all Location History entries at any time by logging into their Google account or by enabling auto-deletion of their Location History records older than a set number of months.

17.     Location data, such as the location data in the possession of Google in the form of its users' Location Histories, can assist in a criminal investigation in various ways.  As relevant here, I know based on my training and experience that Google has the ability to determine, based on location data collected and retained via the use of Google products as described above, devices that were likely in a particular geographic area during a particular time frame and to determine which Google account(s) those devices are associated with.  Among other things, this information can indicate that a Google accountholder was near a given location at a time relevant to the criminal investigation by showing that his/her device reported being there.

18.     Based on my training and experience, I know that when individuals register with Google for an account, Google asks subscribers to provide certain personal identifying information.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because

6

the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, this information often provide clues to their identity, location, or illicit activities.

19.     Based on my training and experience, I also know that Google typically retains and can provide certain transactional information about the creation and use of each account on its system. This information can include the date on which the account was created, the length of service, records of login (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, Google often has records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

## PROBABLE CAUSE

20.     Within a span of one month, beginning on or about December 4, 2022, through approximately January 3, 2023, there were four shootings at dwellings owned or occupied by New Mexico State Legislators and Bernalillo County Commissioners and their families.

21.     In addition to the information outlined below, I believe that all four shootings may be connected and politically motivated because: (i) all the shootings occurred within a span of one month shortly after statewide and nationwide elections on November 8, 2022; (ii) all the victims are elected officials in the State of New Mexico; (iii) all the shootings were executed in a similar manner wherein one to two quick volleys of shots were fired toward or directly at the front of the

victims' residences; and (iv) all the victims are affiliated with the same political party, the Democratic Party.

### December 4, 2022:  Shooting at 1517 Cornell Drive SE

22.     On or about December 4, 2022, at approximately 4:41 p.m. approximately eight rounds were fired into a residence located at 1517 Cornell Drive, SE, Albuquerque, New Mexico 87106 ("Residence 1").

23.     Bernalillo County Commissioner Adriann Barboa ("Barboa") resides at Residence 1.  Barboa served as a Commissioner for District 3 at the time of the shooting and continues to serve in that capacity.  She is also a member of the Democratic Party.

24.     Barboa, as a Bernalillo County Commissioner, is a certified election official. Specifically, she, along with other Bernalillo County Commissioners, is responsible for certifying election results for Bernalillo County[1] and is protected by 18 U.S.C. § 245(b).

25.     Audio of the shooting was recorded by ShotSpotter.  ShotSpotter is a system that uses acoustic sensors to detect and locate gunshots using triangulation.  Sensors capture the precise time and audio associated with sounds that may represent gunfire.  This data is used to locate the incident and is then filtered by machine algorithms to classify the event as a potential gunshot. ShotSpotter identified shots as originating in the street adjacent to 1517 Cornell Drive, SE:

---

[1] N.M.S.A. § 1-13-1(A) provides that the "board of county commissioners is ex officio the county canvassing board in each county."  N.M.S.A. § 1-13-13(A) also provides that the "county canvassing board shall meet to approve the report of the canvass of the returns and declare the results [of an election]" between six and thirteen days following the election in a county "with more than one hundred fifty thousand voters."



26.     Barboa was not home at the time of the shooting.   However, Barboa and her daughter were home approximately two hours before the shooting.

27.     At the time of the shooting, there were two trucks and a sedan parked in front of Residence 1.  This is consistent with what Residence 1 would have looked like in early December 2022 if Barboa had been home based on her regular driving patterns.  Barboa purchased a new vehicle the day before the shooting such that the number of vehicles in the driveway was consistent with her being home at the time.

28.     Barboa returned home from shopping at around 6:00 p.m.  When she returned, she noticed that the glass in her "storm door" was broken.  Barboa joked to her partner that someone must have thrown a rock through the window to get their attention.  Barboa also noticed what appeared to be a bullet hole in the wall.  Additionally, her sliding glass door was shattered.  Upon further inspection, Barboa found at least 5 bullet holes on the facade of her home and the vehicles in her driveway near the front of the house.

29.     Gunshots are not uncommon in Barboa's neighborhood.  However, Barboa never thought that her house would be shot because she is not involved in criminal activity.  Thus, Barboa believed that the shooting was targeted.  Barboa suspected that she might have been targeted

9

because she has previously advocated for various causes such as access to abortion services and work for the homeless. She also thought that the shooting could have been related to the November 2022 election.

30.     Barboa reported the shooting to both the Bernalillo County Sheriff's Office ("BCSO") and the Albuquerque Police Department ("APD"). Responding officers recovered spent bullet casings at Residence 1.

31.     Barboa reported to me that she was traumatized by the event.

32.     Barboa is friends with Debbie O'Malley ("O'Malley"). O'Malley is a former Bernalillo County Commissioner. O'Malley's house was also shot at on December 11, 2022. (*See* ¶¶ 41-46, *infra*.) After she learned that O'Malley's house was shot at, Barboa believed that the shootings were related.

### December 8, 2022: Shooting at 2955 Moya Road NW

33.     On or about December 8, 2022, at approximately 6:52 a.m., multiple bullets were fired into a residence located at 2955 Moya Road NW, Albuquerque, New Mexico 87104 ("Residence 2").

34.     New Mexico State Representative and now Speaker of the New Mexico House of Representatives Javier Martinez ("Martinez"), his wife Diana Martinez ("Diana"), and their two minor children reside at Residence 2.

35.     Martinez is a member of the Democratic Party. He has served in the New Mexico House of Representatives since January 2015. Martinez won re-election in the November 2022 electoral cycle.

36.     Diana was home at the time of the shooting along with her minor children. The three of them were in their living room.

37.     Diana heard five or six very loud and rapid bangs.  She believed they were gunshots and was concerned because they sounded close to the house.  She looked out the window and did not see anything.  While looking out her window, she saw a neighbor on his phone.  She later learned the neighbor was calling the police.  At that time, Diana did not know her home had been struck by bullets.

38.     Later that morning, while getting ready for work, Diana, who works from home, found a cracked wall tile in her bathroom.  Diana believed that the cracked tile was odd.  While working, Diana continued to contemplate and fixate on the broken tile.  Later that day, Diana saw holes on the garage door and concluded that they were bullet holes.  Diana also concluded that the broken tile in her bathroom was likely damaged by at least one bullet.

39.     The garage door where bullet holes were found faces West toward Gabaldon Dr. NW near the intersection of Moya Rd. NW and Gabaldon Dr. NW in Northwest Albuquerque:



40.     That same day, Diana contacted APD and officers were dispatched to the scene.  At least one bullet was recovered at Residence 2 and sent to the APD Crime Lab.

### December 11, 2022:  Shooting at 3555 7ᵗʰ Street NW

41.     On or about December 11, 2022, at approximately 1:41 a.m., multiple bullets were fired into a residence located at 3555 7ᵗʰ Street NW, Albuquerque, New Mexico 87107 ("Residence 3").

42.     O'Malley and her husband reside at Residence 3.  At the time of the shooting, O'Malley was serving as a Bernalillo County Commissioner for District 1.  Her term expired on or about December 31, 2022.  She is also a member of the Democratic Party.

43.     At the time of the shooting, O'Malley was a Bernalillo County Commissioner and accordingly a certified election official.  Specifically, she, along with other Bernalillo County Commissioners, was responsible for certifying election results for Bernalillo County, (*see* ¶ 24, n.1, *supra*), and is protected by 18 U.S.C. § 245(b).

44.     Audio of the shooting was recorded by ShotSpotter.  ShotSpotter identified the shots as originating just south of 3555 7ᵗʰ Street NW:



| INCIDENT | 578-120468 | LOCATION | 35.119080, -106.650716 |
| DATE/TIME | DEC 11, 2022 01:41:41 | ADDRESS | 3555 7TH ST NW |
| ROUNDS | 12 | AREA | 23/236 |
| CAD ID | 223450073 | TAGS | High Capacity |

45.     O'Malley and her husband were home and in bed asleep at the time of the shooting and heard two series of loud noises.  First, they heard a series of what sounded like loud bangs on their front door.  O'Malley initially thought it was one of her children.  Second, approximately 30 seconds later, they heard a second series of loud noises that sounded like gunshots.

46.     O'Malley often hears gunshots in her neighborhood and did not immediately realize that her house had been struck by bullets.  A few days later, O'Malley and her husband noticed damage to their residence and reported the incident to BCSO.  The shots appeared to be directed toward the front of her house.

### January 3, 2023:  Shooting at 9132 Suncrest Ave. SW

47.     On or about January 3, 2023, at approximately 12:37 a.m., multiple bullets were fired into a residence located at 9132 Suncrest Ave. SW, Albuquerque, New Mexico 87121 ("Residence 4").

48.     New Mexico State Senator Linda Lopez ("Lopez"), her adult son, and her minor daughter live at Residence 4.  Lopez is also a member of the Democratic Party. Lopez has served in the New Mexico Senate since 1997.  Lopez ran for re-election in November 2020 and her current term expires in January 2025.  As such, Lopez was not required to run for re-election in the November 2022 election cycle but is a presumptive candidate for re-election in next year's election.

49.     Audio of the shooting was recorded by ShotSpotter.  ShotSpotter identified the shots as originating adjacent to 9132 Suncrest Ave. SW near the front of the house:



| INCIDENT | 581-239173 | LOCATION | 35.059181, -106.735470 |
| DATE/TIME | JAN 03, 2023 00:37:38 | ADDRESS | 9128 SUNCREST RD SW |
| ROUNDS | 12 | AREA | 12/122 |
| CAD ID | 230030032 | TAGS | High Capacity, Full Auto |

50.     Lopez, her adult son, and minor daughter were home and in their respective beds at the time of the shooting.

51.     Lopez heard gunshots and a "ping" above her head.  Lopez's daughter then came into her room and asked what the noise was.  Lopez's daughter also stated that she had felt "sand" fall onto her face.

52.     Lopez did not turn on the lights and was frightened.  Lopez was unaware that her house had been struck by bullets and went back to bed.

53.     At approximately 6:30 a.m., Lopez woke up and went to prepare for the day.  She noticed a hole in her bathroom wall.  She also found a hole in a closet, her garage, and her daughter's bedroom wall.

54.     Lopez contacted APD and officers were dispatched to her residence.  Bullet casings were recovered from the front of Residence 4 indicating that bullets were directed toward the front of Lopez's house.

55.     In my experience, most people always carry cellphones with them.[2]  Therefore, there is probable cause to believe that the person(s) who committed the shootings carried a cellphone at the time of the crime.  There is probable cause to believe the location of cellphones will show up at or near the scenes of the shootings, which are: 1517 Cornell Dr. SE, Albuquerque, New Mexico 87106 (Residence 1); 2955 Moya Road NW, Albuquerque, New Mexico 87104 (Residence 2); at 3555 7th Street NW, Albuquerque, New Mexico 87107 (Residence 3); and 9132 Suncrest Ave. SW, Albuquerque, New Mexico 87121 (Residence 4).  The precise geocoordinates for the suspected areas where the bullets associated with the shootings originated from and where the person(s) who committed the shootings likely were at the times of the shootings are depicted in Attachment A.

56.     Based on the foregoing, I submit that there is probable cause to search information that is currently in the possession of Google and that relates to the devices that reported being within the Target Locations described in Attachment A during the time period described in Attachment A for evidence of the crime(s) under investigation.  The information to be searched includes (1) identifiers of each device; (2) the location(s) reported by each device to Google and the associated timestamp; and (3) basic subscriber information for the Google account(s) associated with each device.

57.     The proposed warrant sets forth a multi-step process whereby the government will obtain the information described above.  Specifically, as described in Attachment B.I:

---

[2] See United States v. Carpenter, 138 S. Ct. 2206, 2218 (2018) (noting that individuals "compulsively carry cell phones with them all the time."); see also Riley v. California, 134 S. Ct. 2473, 2490 (2014) (referencing a poll finding that "nearly three-quarters of smart phone users report being within five feet of their phones most of the time . . . ").

a.  Using Location History data, Google will identify those devices that it calculated were or could have been (based on the associated margin of error for the estimated latitude/longitude point) within the Target Location described in Attachment A during the time period described in Attachment A.  For each device, Google will provide a anonymized identifier, known as a Reverse Location Obfuscation Identifier ("RLOI"), that Google creates and assigns to device for purposes of responding to this search warrant; Google will also provide each device's location coordinates along with the associated timestamp(s), margin(s) of error for the coordinates (*i.e,.* "maps display radius"), and source(s) from which the location data was derived (*e.g.*, GPS, wi-fi, bluetooth), if available.  Google will not, in this step, provide the Google account identifiers (*e.g.,* example@gmail.com) associated with the devices or basic subscriber information for those accounts to the government.

b.  The government will identify to Google the devices appearing on the list produced in step 1 for which it seeks the Google account identifier and basic subscriber information.  The government may, at its discretion, identify a subset of the devices.

c.  Google will then disclose to the government the Google account identifier associated with the devices identified by the government, along with basic subscriber information for those accounts.

58.     This process furthers efficiency and privacy by allowing for the possibility that the government, upon reviewing contextual information for all devices identified by Google, may be able to determine that one or more devices associated with a Google account (and the

associated basic subscriber information) are likely to be of heightened evidentiary value and warrant further investigation before the records of other accounts in use in the area are disclosed to the government.

## CONCLUSION

59.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c).

60.     I further request that the Court direct Google to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

SA John W. Howard
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _____ June 29 _____, 2023.

JENNIFER M. ROZZONI
UNITED STATES MAGISTRATE JUDGE

17

**ATTACHMENT A**

**Property To Be Searched**

This warrant is directed to Google LLC and applies to:

(1) Location History data, sourced from information including GPS data and information about visible wi-fi points and Bluetooth beacons transmitted from devices to Google, reflecting devices that Google calculated were or could have been (as indicated by margin of error, *i.e.,* "maps display radius") located within the geographical region bounded by the latitudinal and longitudinal coordinates, dates, and times below ("Initial Search Parameters"); and

(2) identifying information for Google Accounts associated with the responsive Location History data.

<u>Initial Search Parameters</u>

<u>Search Parameter 1</u>

- Date: December 4, 2022

- Time Period:  4:01 p.m. to 4:46 p.m. MST

- Target Location:   Geographical area identified as a polygon with four latitude/longitude coordinates identified below:

1



Search Parameter 2

- Date:  December 8, 2022

- Time Period:  6:22 a.m. to 6:57 a.m. MST

- Target Location:   Geographical area identified as a polygon with four
  latitude/longitude coordinates identified below:

| 35.11429263358894, -106.68313445855581 | | 35.11428219680358, -106.68298773226718 |
|---|---|---|
| |  | |
| 35.113306351466456, -106.68339601411381 | | 35.113241120746444, -106.683214201104 |

Search Parameter 3

- Date:  December 11, 2022

- Time Period:  1:13 a.m. to 1:48 a.m. MST

- Target Location:   Geographical area identified as a polygon with four latitude/longitude coordinates identified below:

3

| 35.11940971408891, -106.65248892001868 | | 35.11911572430076, -106.65065972938713 |
|---|---|---|
| 35.117798007037145, -106.65250817465693 | | 35.11754601086981, -106.65099347644973 |

Search Parameter 4

- Date: January 3, 2023

- Time Period: 12:18 a.m. to 12:53 a.m. MST

- Target Location:   Geographical area identified as a polygon with four latitude/longitude coordinates identified below:

| 35.059705201697255, -106.73558064192707 | | 35.0597255527837, -106.73538588765246 |
|---|---|---|
| |  | |
| 35.059033612998455, -106.73546876181186 | | 35.05905057237701, -106.735307157201 |

5

## ATTACHMENT B

### Particular Items to Be Seized

**I.        Information to be disclosed by Google**

The information described in Attachment A, via the following process:

1.        Google shall query location history data based on the Initial Search Parameters specified in Attachment A.  For each location point recorded within the Initial Search Parameters, and for each location point recorded outside the Initial Search Parameters where the margin of error (*i.e.*, "maps display radius") would permit the device to be located within the Initial Search Parameters, Google shall produce to the government information specifying the corresponding unique device ID, timestamp, location coordinates, display radius, and data source, if available (the "Device List").

2.        The government shall review the Device List and identify to Google the devices about which it seeks to obtain Google account identifier and basic subscriber information.  The government may, at its discretion, identify a subset of the devices.

3.        Google shall disclose to the government identifying information, as defined in 18 U.S.C. § 2703(c)(2), for the Google Accounts associated with each device ID appearing on the Device List about which the government inquires.

1

II.      **Information to Be Seized**

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 245(b)(1)(A), Interference with Federally Protected Activities and 18 U.S.C. § 924(c), Use of a Firearm During and in Relation to a Crime of Violence that have been committed on or about December 4, 2022, December 8, 2022, December 11, 2022, and January 3, 2023.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC
## RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE
## 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws

of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in

this certification is true and correct.  I am employed by **[PROVIDER]**, and my title is

_____.  I am qualified to authenticate the records attached hereto

because I am familiar with how the records were created, managed, stored, and retrieved.  I state

that the records attached hereto are true duplicates of the original records in the custody of

**[PROVIDER]**.  The attached records consist of _____ **[GENERALLY DESCRIBE**

**RECORDS (pages/CDs/megabytes)]**.  I further state that:

      a.     all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth by, or from information transmitted by, a person with

knowledge of those matters, they were kept in the ordinary course of the regularly conducted

business activity of **[PROVIDER]**, and they were made by **[PROVIDER]** as a regular practice;

and

      b.     such records were generated by **[PROVIDER'S]** electronic process or system

that produces an accurate result, to wit:

           1.     the records were copied from electronic device(s), storage medium(s), or

file(s) in the custody of **[PROVIDER]** in a manner to ensure that they are true duplicates of the

original records; and

1

2.      the process or system is regularly verified by **[PROVIDER]**, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____
Date                                    Signature

2